PEOPLE v LIVINGSTON

1. HOMICIDE—FIRST-DEGREE MURDER—PREMEDITATION—MOTION FOR
   DISMISSAL—EVIDENCE—SECOND LOOK.

   A defense motion to dismiss a first-degree murder charge at the
   close of the prosecution's case because of insufficient evidence
   of premeditation will not be granted where, taking the evidence
   in a light most favorable to the prosecution, there was *any*
   evidence presented from which a jury could reasonably infer
   premeditation and that there was sufficient time to allow the
   defendant an opportunity for a second look prior to the shoot-
   ing.

2. HOMICIDE—FIRST-DEGREE MURDER—INVOLUNTARY MANSLAUGHTER
   —INSTRUCTIONS TO JURY—MANSLAUGHTER—EVIDENCE.

   Failure of a trial court to include a definition of involuntary
   manslaughter in its charge to the jury in a first-degree murder
   trial was not error where the offense of manslaughter was
   properly defined for the jury, and no evidence was presented
   which would justify a verdict of involuntary manslaughter.

3. HOMICIDE—FIRST-DEGREE MURDER—INSTRUCTIONS TO JURY—MAL-
   ICE—INSTRUCTIONS AS A WHOLE.

   An erroneous instruction to the jury that "in the term malice is
   included not only anger, hatred and revenge but every other
   unlawful and unjustifiable motive" does not result in reversal
   of a second-degree murder conviction where the court did not
   stop at this bare definition of malice but included qualification
   of that language; jury instructions are to be considered in their
   entirety.

Appeal from Oakland, William R. Beasley, J.
Submitted June 13, 1975, at Lansing. (Docket No.
19369.) Decided August 11, 1975.

REFERENCES FOR POINTS IN HEADNOTES
[1] 40 Am Jur 2d, Homicide § 439.
[2] 40 Am Jur 2d, Homicide § 529 *et seq.*
[3] 40 Am Jur 2d, Homicide § 500.

Richard Livingston was convicted of second-degree murder. Defendant appeals. Affirmed.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *L. Brooks Patterson,* Prosecuting Attorney, *Robert C. Williams,* Chief Appellate Counsel, and *Carlton R. Roeser,* Assistant Appellate Counsel, for the people.

*James L. Oliphant,* for defendant on appeal.

Before: ALLEN, P. J., and D. F. WALSH and O'HARA,* JJ.

D. F. WALSH, J. The defendant was charged with first-degree murder, MCLA 750.316; MSA 28.548, for the shooting death of Dale Mitchell. A jury returned a verdict of guilty of murder in the second degree, MCLA 750.317; MSA 28.549, and the defendant was sentenced to serve 12 to 30 years in prison on December 18, 1973. The principal assignment of error is that there was not sufficient evidence of premeditation and deliberation to justify the submission of the case to the jury with instructions on first-degree murder.

The homicide took place at Bob's Chicken House, a bar and restaurant in Waterford, on August 4, 1973. Janice Richards, one of the waitresses at Bob's, testified that the victim Dale Mitchell was in the bar at around 3 p.m. that afternoon and that the defendant entered the bar at about that time, looked around and said "I'll be back when I'm prepared". When defendant did return, at approximately 5 p.m., the witness said that she served him a beer and talked with him briefly. She also spoke with the victim who asked

---

* Former Supreme Court Justice, sitting on the Court of Appeals by assignment pursuant to Const 1963, art 6, § 23 as amended in 1968.

her assistance in identifying the defendant in the bar.

Miss Richards testified that the defendant had told her a few days earlier that Mitchell was "looking for him" but that "he wouldn't fight Dale [Mitchell] because he knew Dale could hurt him in a fair fight". (There was testimony that the deceased was a well-built man of approximately 210 pounds, while defendant weighed between 158 and 160 pounds.) Miss Richards had also spoken with Mitchell himself who had mentioned that "he wanted to tell Dick to stay away from his wife".

Barbara Dodt, another employee of Bob's Chicken House, also testified as to the defendant's brief appearance in the bar at around 3 p.m. She said he returned at about 5 o'clock, sat down with her and bought her a beer and one for himself. According to Miss Dodt the defendant mentioned that Dale Mitchell was in the bar, told her that he was "going into the bathroom to see what Dale will do" and "that if there was any trouble, that he was prepared".

Shortly thereafter, according to the bartender's testimony, Mitchell followed the defendant into the men's restroom. Two other patrons were also using the facility, one of whom was William Cullen. He testified as to the argument which developed between Mitchell and the defendant:

"Within about, I would say, ten seconds, right around that neighborhood of time, I heard some words. The words led to the fact that I thought there was going to be more or less of a bar fight * * * one man, Mitchell, I heard him use a couple of foul words, M.F. and S.B., and he said, 'You better have something in your hand,' to the other man.

"The other man says, 'I do have something in my hand.' "

Soon after Mr. Cullen and the other patron had exited the washroom two gunshots were heard and the defendant was seen by several of the witnesses coming out of the restroom and leaving the bar with a gun in his hand.

The defendant entered his van and drove it to the residence of Thomas Rasberry, arriving there shortly after 6 p.m. He told Rasberry that he was in trouble, used the telephone, asked Rasberry if he would make sure that his wife got the van and then left on foot. He disposed of his gun in a stack of old tires and traveled to his father's home in South Dakota. He returned voluntarily to face the charges against him after he learned of Mitchell's death.

When the defendant took the witness stand he supplemented, but did not contradict, the earlier testimony. He indicated that he had been warned by several people that Mitchell was going to kill him because he had spent a weekend with Mitchell's wife and that three days prior to the shooting he had begun to carry a gun. He testified that his gun was loaded and that he was "prepared" before he entered the restroom. He knew Mitchell was in Bob's the evening of the shooting but "was hoping that he would do nothing".

Defendant recounted his visit to the restroom, stating that Mitchell followed him in, started an argument and uttered several threats against him. The defendant did admit, however, that Mitchell never put his hands on him and that he did not appear to have anything in his hands. His version of the shooting is that Mitchell placed his hand in his right pocket, and advanced toward the defendant. Whereupon defendant shot Mitchell twice. An autopsy revealed two wounds, one in the right neck, the other in the abdominal area.

Taking the evidence in a light most favorable to the state, *People v Watkins,* 388 Mich 717, 722; 202 NW2d 780 (1972), we must determine (1) whether there was *"any* evidence from which a jury could reasonably infer premeditation and (2) whether there was sufficient time to allow the defendant an opportunity for a 'second look' prior to the shooting". *People v Berthiaume,* 59 Mich App 451; 229 NW2d 497 (1975), *People v Meier,* 47 Mich App 179, 191–192; 209 NW2d 311 (1973).

*Berthiaume* and *Meier* are factually similar to the instant case so that some discussion of those cases will be helpful, recognizing as we do that "no two murders, or murderers, are alike". *People v Meier, supra,* at 183. Berthiaume had driven his victim to a secluded spot in a state park and had taken a shotgun and ammunition with him. As in the instant case, Berthiaume stated that the victim had uttered threatening remarks and that the weapon had been discharged in self-defense. That Berthiaume had in his possession a deadly weapon well before the slaying was one fact from which a jury could have inferred a premeditated murder. Of course, such a finding could not rest on this evidence standing alone without other evidence of premeditation. *People v Morrin,* 31 Mich App 301, 333–334; 187 NW2d 434 (1971). In the instant case Livingston admitted carrying a gun for three days prior to the shooting and a jury could have found, from the remarks relative to his state of preparedness, that he intended to use it on Mitchell.

The *Meier* case, too, involved a homicide with a barroom venue. The court stressed the fact that Meier and the victim had had two confrontations in the bar, which tended to show that there was sufficient time for premeditation. *People v Meier, supra,* at 192–193. Livingston had seen Mitchell in

the bar at 3 p.m., knew he was present during his second visit at 5 o'clock, and walked past him on the way to the washroom. A jury could have inferred—again, from the remarks attributed to defendant—that Livingston fully expected a confrontation in the restroom and that there was a sufficient time lapse to afford Livingston an opportunity to subject his conduct to a "second look" or reflection. *People v Meier, supra,* at 191.

An equally divided Supreme Court upheld a second-degree murder conviction holding that there was sufficient evidence presented on the issue of premeditation in *People v Watkins,* 388 Mich 717; 202 NW2d 780 (1972). The decisive issue was whether it was proper to allow a jury to predicate such a finding on a so-called equivocal statement made by the defendant prior to stabbing the victim.

In the instant case, Livingston's remarks which could have been interpreted by a jury as evidencing an intent to kill did not stand alone. They were accompanied by undisputed evidence of an argument preceding a killing with a handgun, a deadly weapon not of the "impromptu" variety, see *People v Horn,* 41 Mich App 755, 763; 201 NW2d 107 (1972), dissent, LEVIN, J., but rather one which a jury could have determined was acquired in a "cool state of blood in preparation for homicide". *People v Horn, id.* Under these circumstances we hold that there was evidence from which a jury could reasonably infer a premeditated killing. Accordingly, it was proper for the court to submit instructions on first-degree murder.

The defendant next contends that the court's failure to include in its instructions to the jury a distinction between voluntary and involuntary

manslaughter may have led the jury to the conclusion that an intent to kill could be presumed merely from the act of killing itself.

The defendant maintains that *People v Townes,* 391 Mich 578; 218 NW2d 136 (1974), requires the inclusion of a definition of involuntary manslaughter in the trial court's charge to the jury. In that case the trial judge had mistakenly combined a reference to the elements of involuntary manslaughter with those of voluntary manslaughter. The Supreme Court found those instructions so fundamentally erroneous as to deny the defendant a fair trial.

Two features of this case distinguish it from *Townes:* (1) the offense of manslaughter *was* properly defined for the jury, see *People v Droste,* 160 Mich 66, 79; 125 NW 87 (1910), *Maher v People,* 10 Mich 212, 218–219; 81 AD 781 (1862), *People v Townes, supra,* at 590; and (2) no evidence was presented which would justify a jury verdict of involuntary manslaughter. The defendant admitted discharging the gun two times into the body of the deceased and he does not maintain that the shooting was accidental, negligent, careless or unintentional; rather, his claim was that he shot Mitchell in self-defense. Therefore the trial court was not obliged to instruct the jury as to the distinction between voluntary and involuntary manslaughter. *People v Knott,* 59 Mich App 105; 228 NW2d 838 (1975), *People v Carter,* 387 Mich 397, 422; 197 NW2d 57 (1972), *cf. People v Smith,* 55 Mich App 184, 187–190; 222 NW2d 172 (1974).

Finally, the defendant is correct in his assertion that the trial judge gave an erroneous instruction when he stated in his supplemental charge to the jury: "In the term malice is included not only anger, hatred and revenge but every other unlaw-

ful and unjustifiable motive." But it is equally true that the jury instructions are to be considered in their entirety. They are not to be scrutinized line by line by the appellate courts. *People v Frank Johnson,* 58 Mich App 1, 5; 226 NW2d 730 (1975). We distinguish the case of *Nye v People,* 35 Mich 16 (1876), for the same reason that the Supreme Court did in *People v Borgetto,* 99 Mich 336, 340; 58 NW 328 (1894):

"Unlike the case of *Nye v People,* 35 Mich 16, the court, in this case, did not stop with the bare definition of 'malice' contained in the first part of the quotation, ending with the word 'motive', but it included the qualification of that language by what followed. In the case of Nye the jury were told that the offense would be murder if Nye and Betts, or Betts alone, began the attack. Again, the charge in the case of Nye lost sight of the distinctions between murder and manslaughter, which here were carefully described."

Accordingly the defendant's conviction is affirmed.