*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

PAUL THOMAS GABRIEL,

        Defendant-Appellant.

UNPUBLISHED
January 11, 2024

No. 360162
Muskegon Circuit Court
LC No. 19-000140-FC

Before: REDFORD, P.J., and RIORDAN and FEENEY, JJ.

PER CURIAM.

Defendant, Paul Thomas Gabriel, appeals by right following his conviction of first-degree murder, MCL 750.316. The trial court sentenced defendant to serve life in prison without the possibility of parole. On appeal, defendant presents four arguments. First, defendant argues that trial counsel was ineffective for failing to request M Crim JI 7.16 regarding the duty to retreat and for failing to present an expert witness regarding defendant's personality characteristics. Second, defendant argues that there was insufficient evidence to establish that he did not act in self-defense and, alternatively, that the verdict was against the great weight of the evidence. Third, defendant argues that there was insufficient evidence to establish premeditation and, alternatively, that the verdict was against the great weight of the evidence. Fourth, defendant argues that the prosecution failed to preserve critical evidence and violated defendant's constitutional right of due process. For reasons stated herein, we affirm defendant's conviction.

## I. RELEVANT FACTS AND PROCEEDINGS

This case arises out of a fatal shooting at a condominium complex in an enclosed, glassed-in walkway between the garage and the lobby. It was undisputed that a physical altercation occurred in the garage of the complex between defendant and the victim, during which defendant pointed a gun at the victim. Subsequently, the victim left the garage through a locked door with two witnesses and entered into an adjoining walkway bridge in the direction of the victim's father's condominium. Shortly after, defendant used the same door and bridge to find that the victim was still standing there with the witnesses and proceeded to point his gun at the victim again. After unsuccessfully attempting to get the victim to leave with them, the witnesses left the bridge,

-1-

leaving defendant and the victim alone. Ultimately, defendant fatally shot the victim on the bridge. Throughout the case proceedings, defendant maintained that he shot the victim in self-defense.

Ultimately, the jury convicted defendant as indicated earlier. Subsequently, defendant moved postconviction for a new trial and a *Ginther*[1] hearing. After the *Ginther* hearing, the trial court denied defendant's motion for a new trial.

Defendant now appeals.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

First, defendant argues that defense counsel was ineffective for failing to request M Crim JI 7.16 regarding the duty to retreat. Additionally, defendant argues that defense counsel was ineffective for failing to present an expert witness regarding defendant's personality characteristics. We disagree.

## A. JURY INSTRUCTIONS

First, defendant argues that defense counsel was ineffective for failing to request M Crim JI 7.16 regarding self-defense and the duty to retreat.

Whether a defendant has been deprived of the effective assistance of counsel presents a mixed question of fact and constitutional law. *People v Trakhtenberg*, 493 Mich 38, 47; 826 NW2d 136 (2012). The trial court's factual findings are reviewed for clear error while its constitutional determinations are reviewed de novo. *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). "Clear error exists when the reviewing court is left with the definite and firm conviction that a mistake has been made." *People v Anderson*, 284 Mich App 11, 13; 772 NW2d 792 (2009) (quotation marks and citation omitted). We review de novo whether a particular act or omission fell below an objective standard of reasonableness under prevailing professional norms and prejudiced the defendant. *Id.* at 19-20.

"A court must properly instruct the jury so that [the jury] may correctly and intelligently decide the case." *People v Traver*, 502 Mich 23, 31; 917 NW2d 260 (2018) (quotation marks and citation omitted; alteration in original). Jury instructions must include "all elements of the crime charged, and must not exclude from jury consideration material issues, defenses or theories if there is evidence to support them." *Id.* (quotation marks and citation omitted). The instructions must "fairly present[] the triable issues to the jury." *People v Dobek*, 274 Mich App 58, 82; 732 NW2d 546 (2007). Jury instructions must be considered "as a whole, rather than piecemeal, to determine whether any error occurred." *Traver*, 502 Mich at 31 (quotation marks and citation omitted).

The Michigan Constitution guarantees the right to have the assistance of counsel in a criminal proceeding. See Const 1963, art 1, § 20. "[T]he right to counsel is the right to the effective assistance of counsel." *Strickland v Washington*, 466 US at 668, 686; 104 S Ct 2052; 80 L Ed 2d 674 (1984) (quotation marks and citation omitted). If the defense counsel provided

---

[1] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

deficient assistance and the deficient performance prejudiced the defendant's trial, then the defendant is entitled to a new trial. *Id*. at 687. A defendant who claims ineffective assistance "must show that counsel's representation fell below an objective standard of reasonableness . . . under prevailing professional norms." *Id*. at 688. The defendant must also show that there was a reasonable probability that, but for counsel's error, the result of the proceedings would have been different. *Id*. at 694. There is a "strong presumption that counsel's performance was born out of sound trial strategy." *Trakhtenberg*, 493 Mich at 52. "[T]rial counsel cannot be faulted for failing to raise an objection or motion that would have been futile." *People v Fike*, 228 Mich App 178, 182; 577 NW2d 903 (1998).

In this matter, the *Ginther* hearing was conducted by the trial judge who presided over all aspects of the trial following bindover. The court was very familiar with all aspects of the case. The hearing itself lasted 2 hours and 20 minutes, during which time the trial defense counsel testified in great detail about his litigation experience, his extensive pretrial preparations, meetings with his client, concerns about the client, and strategic decisions made.

In addressing concerns about his client, counsel testified:

Mr. Gabriel came off as one of the most, contentious, hostile, aggressive personalities I have ever met. When I started this case, I spent half of my time begging him to listen to me and work with me so he would tone down his hostility and his aggressiveness. He was absolutely obsessed over his relationship with Tony Federighe. He was obsessed with AJ. And the last, thing in the world I'm going to do is get his personality before the jury and how he would have behaved and what he wanted to do.

In discussing his analysis and strategy related to M Crim JI 716, counsel testified for five pages. Following this testimony, appellate defense counsel asked trial counsel why he would not have asked for the jury to be instructed on no obligation to retreat. The prosecutor objected to this question and the trial court in sustaining the objection stated, "He did answer why specifically in detail why he strategically did not have 716."

At the *Ginther* hearing substantial evidence was presented that defense counsel was aware of the no-duty-to-retreat jury instruction and originally wanted to include the instruction before trial. However, once all the evidence was presented at trial, defense counsel had concerns regarding the specific language in the jury instruction that stated, "[i]f the defendant could have safely retreated but did not do so, you may consider that fact in deciding whether the defendant honestly and reasonably believed he needed to use deadly force." Defense counsel explained that the prosecution would have emphasized the language of the instruction and that the instruction would have hurt defendant's argument. Additionally, based on the unique circumstances of defendant's case, defense counsel explained that both defendant and the victim did not have a duty to retreat, which would have impacted the necessity of a no-duty-to-retreat instruction because neither of them had a duty to retreat.

In this case, we find no reasonable probability that the outcome of the trial would have been different but for defense counsel's failure to request a no-duty-to-retreat instruction. Before the jury could consider any duty-to-retreat argument, the jury had to determine that defendant "honestly and reasonably believed that he was in imminent danger of death or serious bodily harm." *People v Riddle*, 467 Mich 116, 127; 649 NW2d 20 (2002).

In this case, testimony established that defendant followed the victim into the bridge after the witnesses convinced the victim to leave the garage and abandon the initial confrontation. Evidence was presented that defendant could have used alternative routes to access his condominium or, at the very least, wait for a period of longer than less than one minute to return to his condominium using the bridge. Additionally, the evidence showed that defendant immediately pointed his gun at the victim upon entering the bridge and that the victim never presented any weapon in response. Instead, although contested, evidence was presented that defendant took steps toward the victim and closed the gap between them while they were on the bridge until, ultimately, defendant shot the victim and walked away in a calm and composed manner. The victim was not blocking defendant's path from crossing the bridge or stopping defendant from retreating into the garage when he discovered that the victim was still in the bridge area. Defendant's failure to use alternative routes or wait longer before entering the bridge was evidence that would have contradicted the no-duty-to-retreat jury instruction and would have strengthened the prosecution's argument.

Further, the trial court provided the general self-defense instructions modeled from M Crim JI 7.15. Therefore, even without a no-duty-to-retreat instruction, the general self-defense instruction required the jury to determine whether defendant acted honestly and reasonably in protecting himself. In addition, the trial court properly instructed the jury on the elements of the offenses, the presumption of innocence, the prosecution's burden of proof, the definition of reasonable doubt, defendant's right to remain silent, and the fact that the jury could find defendant guilty of lesser offenses. Accordingly, the trial court's jury instructions presented the issues to the jury, and there was not a reasonable probability that requesting the no-duty-to-retreat instruction would have resulted in a different outcome. Therefore, defendant failed to established that defense counsel was ineffective.

## B. EXPERT WITNESS

Next, defendant argues that defense counsel was ineffective for failing to present an expert witness to testify regarding defendant's behavioral and psychological tendencies.

"[D]ecisions regarding what evidence to present and which witnesses to call are presumed to be matters of trial strategy, and we will not second-guess strategic decisions with the benefit of hindsight." *People v Dunigan*, 299 Mich App 579, 589-590; 831 NW2d 243 (2013).

> [A] claim of ineffective assistance of counsel premised on the failure to call witnesses is analyzed under the same standard as all other claims of ineffective assistance of counsel, i.e., a defendant must show that "(1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's deficient performance, there is a reasonable probability that the outcome would have been different." [*People v Jurewicz*, 506 Mich 914, 914 (2020),[2] quoting *Trakhtenberg*, 493 Mich at 51.]

---

[2] "Supreme Court orders that include a decision with an understandable rationale establish binding precedent." *People v Giovannini*, 271 Mich App 409, 414; 722 NW2d 237 (2006).

A reviewing court "cannot insulate the review of counsel's performance by calling it trial strategy." *Trakhtenberg*, 493 Mich at 52. Defense counsel has a duty to undertake a reasonable investigation and a reviewing court must determine whether a strategic choice was made after a complete investigation. *Id.* "A particular strategy does not constitute ineffective assistance of counsel simply because it does not work." *People v Matuszak*, 263 Mich App 42, 61; 687 NW2d 342 (2004). Although "an attorney's selection of an expert witness may be a 'paradigmatic example' of trial strategy, that is so only when it is made '*after* thorough investigation of [the] law and facts' in a case." *People v Ackley*, 497 Mich 381, 390; 870 NW2d 858 (2015) (citation omitted; alterations in original).

During the *Ginther* hearing, defense counsel testified regarding the specific caselaw associated with ineffective assistance and presenting an expert witness. Defense counsel's testimony evidenced that he considered the options and had a significant knowledge base regarding the applicable caselaw. After review of the law and after a careful investigative process, defense counsel testified that he decided that presenting an expert in this category would only hurt defendant's defense theory at trial.

At the *Ginther* hearing, defense counsel acknowledged that he did not consult a psychological or behavioral expert to evaluate defendant and defendant's conduct following the shooting. Defense counsel testified that, although he had concerns with defendant's demeanor after the shooting, he strongly disagreed with the psychological evaluation report presented at the *Ginther* hearing. Defense counsel explained that he did not feel that the evaluation, based on a brief professional encounter was accurate; rather after spending "50-to-100 hours" with defendant, defense counsel discovered that defendant's personality was "contentious, hostile," and "aggressive" and did not want to have defendant's personality as an issue before the jury. Additionally, defense counsel explained that the expert report concluded that defendant was calm and operated well under pressure; however, to the contrary, defendant decided to follow the victim into the bridge and shoot him instead of waiting for the victim to leave or going to his condo via a different route. Defense counsel testified that he could not make both arguments because the arguments contradicted each other. Additionally, defense counsel testified that he reviewed this decision with defendant's family members, defendant's friends, and even defendant, and everyone agreed with his decision not to use an expert.

To assert that defense counsel was ineffective for failing to call an expert witness, a defendant must offer proof that the expert witness would have testified favorably if called by the defense. *People v Ackerman*, 257 Mich App 434, 455; 669 NW2d 818 (2003). To support his claim, at the *Ginther* hearing, defendant offered a report completed by a forensic psychologist that evaluated defendant's history and defendant's conduct following the shooting. Although defendant offered some proof that an expert witness would have testified favorably if called by defense counsel, defense counsel's performance did not fall below an objective standard of reasonableness.

At trial, defense counsel's theory was that defendant was so fearful and concerned for his well-being that he fatally shot the unarmed victim in self-defense. Defense counsel presented evidence that defendant was the victim of an altercation in the garage and that the victim was the aggressor. Defense counsel presented evidence that defendant was injured during the altercation

in the garage and that the victim's statements that defendant described as threats led defendant to believe that the victim was trying to seriously injure or kill defendant.

Defense counsel argued that the fatal shooting was a result of a continuous series of chaotic events that justified defendant's shooting as self-defense. Defense counsel emphasized the altercation in the garage and the bridge but concentrated on the victim's behavior and how the victim's behavior caused defendant to feel threatened. Additionally, defense counsel used defendant's call to 911 as evidence that he acted in self-defense and how it contradicted the expert's opinion because he made "all these mistakes" when he called 911. "A defendant's history and psychological makeup may be relevant to explain the reasonableness of a defendant's belief that he or she was in inescapable danger." *People v Orlewicz*, 293 Mich App 96, 102; 809 NW2d 194 (2011). Had defense counsel introduced expert testimony regarding defendant's enhanced ability to remain composed and calm during traumatic and stressful situations, it would have significantly undermined defendant's entire theory of self-defense.

The expert testimony would not have assisted the jury, under defendant's scenario, to determine that defendant honestly and reasonably believed that he was in imminent and grave danger. See *id*. at 103. Accordingly, defense counsel was not ineffective for failing to present an expert witness and corroborating lay witness testimony regarding defendant's conduct.

## III. SUFFICIENCY OF THE EVIDENCE, IN THE ALTERNATIVE, GREAT WEIGHT OF THE EVIDENCE—SELF-DEFENSE

Next, defendant argues that there was insufficient evidence to establish that defendant did not act in self-defense or, alternatively, that the verdict was against the great weight of the evidence.

### A. SUFFICIENCY OF THE EVIDENCE

We review a challenge to the sufficiency of the evidence by reviewing the evidence de novo. *People v Meissner*, 294 Mich App 438, 452; 812 NW2d 37 (2011). We review the evidence "in the light most favorable to the prosecution to determine whether a rational trier of fact could have found the essential elements of the crime to have been proved beyond a reasonable doubt." *Id*.; see also *Jackson v Virginia*, 443 US 307, 324; 99 S Ct 2781; 61 L Ed 2d 560 (1979). We review the trial court's grant or denial of a motion for a new trial for an abuse of discretion. See *People v Rao*, 491 Mich 271, 279; 815 NW2d 105 (2012). A trial court should grant a motion for a new trial only when "the evidence preponderates heavily against the verdict and a serious miscarriage of justice would otherwise result." *People v Lemmon*, 456 Mich 625, 642; 576 NW2d 129 (1998). When reviewing challenges to the sufficiency of the evidence, we must not interfere with the fact-finder's role in deciding the weight and credibility to give to a witness's testimony; this Court may not "determine the credibility of witnesses . . . , no matter how inconsistent or vague that testimony might be." *People v Mehall*, 454 Mich 1, 6; 557 NW2d 110 (1997); see also *Lemmon*, 456 Mich at 646-647.

Circumstantial evidence and the reasonable inferences that arise from the evidence can constitute satisfactory proof of the elements of the crime. *People v Carines*, 460 Mich 750, 757; 597 NW2d 130 (1999). We must consider all the inferences that can be fairly drawn from the

evidence when considering the sufficiency of the evidence because, when evidence is relevant and admissible, "it does not matter that the evidence gives rise to multiple inferences or that an inference gives rise to further inferences." *People v Hardiman*, 466 Mich 417, 428; 646 NW2d 158 (2002). In such cases, it is for the fact-finder alone to "determine what inferences may be fairly drawn from the evidence and determine the weight to be accorded [to] those inferences." *Id*. In a criminal case, due process requires that a prosecutor introduce evidence sufficient to justify a rational trier of fact in finding guilt beyond a reasonable doubt. *People v Wolfe*, 440 Mich 508, 513-514; 489 NW2d 748 (1992).

Under the common law, a person could assert the affirmative defense of self-defense to justify "otherwise punishable criminal conduct, usually the killing of another person, 'if the defendant honestly and reasonably believes his life is in imminent danger or that there is a threat of serious bodily harm and that it is necessary to exercise deadly force to prevent such harm to himself.' " *People v Dupree*, 486 Mich 693, 707; 788 NW2d 399 (2010), quoting *Riddle*, 467 Mich at 127. Before a trial court has an obligation to instruct the jury on self-defense, the defendant must produce some evidence on all the elements of self-defense. *People v Guajardo*, 300 Mich App 26, 35; 832 NW2d 409 (2013). Generally, a person who is not the aggressor may use a reasonable amount of force against an adversary when he or she reasonably believes that he or she is in immediate danger of unlawful bodily harm or that the use of force is necessary to avoid the harm. *Dupree*, 486 Mich at 707. "[T]he touchstone of *any* claim of self-defense, as a justification for homicide, is necessity." *People v Reese*, 491 Mich 127, 144; 815 NW2d 85 (2012) (quotation marks and citation omitted). To justify or excuse what would otherwise be an unlawful homicide, the defendant must present evidence that: (1) he or she honestly and reasonably believed that he or she was in danger, (2) the danger feared was death or serious bodily harm, (3) the action taken appeared at the time to be immediately necessary, and (4) he or she was not the initial aggressor. *Riddle*, 467 Mich at 126-127. Once the defendant satisfies the initial burden to produce evidence on every element of self-defense, the prosecution bears the burden of disproving common-law self-defense beyond a reasonable doubt. *Reese*, 491 Mich at 155.

Whether a defendant acted in self-defense is a question of fact. *People v Prather*, 121 Mich App 324, 330; 328 NW2d 556 (1982). When determining whether the defendant honestly and reasonably believed that he was in danger, the circumstances that justify the use of force must be determined from the circumstances as they appeared to the defendant, not as they actually were. *People v Green*, 113 Mich App 699, 703-704; 318 NW2d 547 (1982). "The necessity element of self-defense normally requires that the actor try to avoid the use of deadly force if he can safely and reasonably do so, for example by applying nondeadly force or by utilizing an obvious and safe avenue of retreat." *Riddle*, 467 Mich at 119.

However, a person is never required to retreat from a sudden, fierce, and violent attack, or under circumstances in which he or she reasonably believes that the aggressor is about to use a deadly weapon, or when he or she is attacked in his or her dwelling. *Id*. at 119-121. Under those circumstances, the person attacked may stand his or her ground and meet force with force; the trial court "should not instruct the jury to consider whether retreat was safe, reasonable, or even possible, because, in such circumstances, the law does not require that the defendant engage in such considerations" when it is uncontested that the defendant was the victim of a sudden and violent attack. *Id*. at 119-120. In comparison, a person who participates in a physical altercation where he or she is a willing participant may not use deadly force should the affray escalate unless

he or she first takes advantage of any reasonable and safe avenue of retreat. *Id*. at 120. Further, regardless of the circumstances, a person "who is attacked in his dwelling is never required to retreat where it is otherwise necessary to exercise deadly force in self-defense." *Id*. This is true even when one is a voluntary participant in mutual combat. *Id*. at 121.

The Self-Defense Act, MCL 780.971 *et seq*., implemented in 2006, did not diminish an individual's right to use deadly force or force other than deadly force in self-defense as provided under the common law; it did not alter the duty to retreat under the common law except as specifically provided under MCL 780.972. See MCL 780.974; MCL 780.973. Under the Self-Defense Act, an individual who is not engaged in a crime may use deadly force anywhere he or she has the legal right to be, with no duty to retreat, if he or she honestly and reasonably believes that the use of deadly force is necessary to prevent him or her, or another, from suffering imminent death, great bodily harm, or sexual assault. MCL 780.972(1). Under the act, certain circumstances create a rebuttable presumption that an individual who used deadly force had an honest and reasonable belief that imminent death, sexual assault, or great bodily harm would occur. MCL 780.951(1). The presumption applies if the individual against whom the force was used was breaking and entering a dwelling or business premises or committing a home invasion, had broken and entered or committed a home invasion and was still present, or was unlawfully attempting to remove another from a dwelling, business premises, or occupied vehicle against his will. MCL 780.951(1)(a). The presumption does not apply, in pertinent part, if the individual against whom the force was used had the legal right to be in the dwelling, business premises, or vehicle or if the individual who used the force was engaged in committing a crime. MCL 780.951(2).

In this case, defendant met his initial burden of producing some evidence from which the jury could conclude that defendant acted in self-defense, so the trial court's jury instruction regarding self-defense was appropriate. Defendant's claim of self-defense turned on whether he honestly and reasonably believed that his life was in imminent danger and that use of deadly force was necessary. Whether defendant had an honest and reasonable belief that the victim imminently endangered his life and that shooting the victim was necessary to prevent such harm was a question of fact for the jury.

In this case, on the basis of the trial testimony before the shooting, defendant presented favorable evidence to support his claim of self-defense. Evidence was presented that a physical altercation occurred in the garage when defendant returned to his vehicle and that the victim may have been the initial aggressor, or at a minimum, the victim appeared to have been dominating the garage fight on the basis of the testimony that the victim jumped to his feet before defendant slowly made his way up from the ground and that defendant sustained a head injury. The evidence also showed that the victim engaged in "locker room talk" and was calling defendant a "pussy," which led defendant to display his holstered gun and eventually unholster the gun and point it at the victim.

Nevertheless, subsequent evidence was presented that contradicted defendant's claim of self-defense. First, evidence was presented that defendant immediately retrieved his gun when there had been absolutely no confrontation. Regarding the initial altercation, evidence was presented that, after defendant displayed his gun, the witnesses convinced the victim to leave the garage and to follow them into the bridge area of the condominium complex. To do this, the witnesses unlocked the door from the garage and the victim followed the witnesses through the

door while the door shut behind the three of them. At this point, the altercation that defendant heavily relies upon in his claim of self-defense had ended, and defendant was no longer at risk of an imminent threat of bodily harm or death. Although defendant was not necessarily required to do so, at this point, defendant had the opportunity to use alternative routes to return to his condominium or, at a minimum, wait more than a minute to go to the same area that defendant witnessed the victim enter.

Instead, defendant gained his composure enough to locate his dropped keys, unlock the door from the garage, and enter into the bridge with his gun immediately pointed at the victim. Once defendant reengaged the victim in the bridge area, the evidence revealed that the victim made statements including: "don't go there," "you pussy," and "if I get that gun, I'll fuck him up." The evidence showed that defendant remained completely silent and did not request that the victim move, stop talking, or that the victim permit defendant to walk by. At this point, the witnesses abandoned their attempts to intervene and separate the two men and instead exited the bridge area. Defendant was initially six feet apart from the victim and the witnesses testified that defendant took very quick steps toward the victim and closed the gap between them as he continued to point his gun directly at the victim without saying a word; "85% to 90%" of the movement was made by defendant. However, defendant argues that the victim would not allow defendant to pass and that the victim moved toward defendant to grab his gun. Eyewitness evidence was presented that the victim moved his hands in response to defendant's movement toward him and that he possibly attempted to grab defendant's gun as the gun fired.

To corroborate witness testimony, the prosecution presented video footage that defendant was the one stepping toward the victim and closing the gap between them and that there was nothing, including the victim, obstructing defendant's path to use the bridge or retreat to the garage. Further, defendant's credibility was at issue due to his inconsistent statements during his interview with law enforcement; he initially explained that he went into the bridge first and that the victim followed him, he gave inconsistent explanations for why he chose to enter the bridge area after the initial altercation, he said the victim was blocking his path in the bridge area, plus defendant called 911 and described defendant's decision to get his gun from his vehicle before any altercation transpired. Additionally, evidence was presented that defendant suffered minimal injuries during the altercation and repeatedly denied medical treatment. Further, video surveillance evidence was presented that, after defendant shot the victim, defendant calmly walked by the victim as he fell to the ground, calmly opened the door while returning his gun to the holster that defendant grabbed from his pocket, and immediately contacted 911 in an arguably composed manner.

On the basis of the evidence presented, the jury could have determined that defendant was the initial aggressor for the altercation that ultimately led to the victim's death by following after the victim through a locked door after the first physical altercation had ended. Additionally, the jury could have determined that defendant did not have a reasonable belief that his life was in imminent danger on the basis that the victim did not have a weapon, was not blocking defendant's path, and did not move aggressively toward defendant until he was forced to respond to defendant's movement toward him. Ultimately, the jury's verdict reflects its assessment of witness credibility and this Court does not interfere with the jury's determination of credibility. *People v Unger*, 278 Mich App 219, 222; 749 NW2d 272 (2008). Although the eyewitness's testimony was impeached during cross-examination revealing some inconsistencies, the jury was nevertheless free to credit the testimony. *People v Russell*, 297 Mich App 707, 721; 825 NW2d 623 (2012).

In *People v Bailey*, 330 Mich App 41, 45, 47; 944 NW2d 370 (2019), this Court determined that the prosecution presented sufficient evidence to rebut the defendant's theory of self-defense after evidence was presented that the defendant walked into a business and walked back out, and after approximately four to seven minutes, the defendant reentered the business, got into an argument with the victim, and, ultimately, shot him. After the shooting, and unlike defendant in this case, the defendant "appeared shaken and distressed," and, at trial, the defendant testified that the victim threatened him with a gun. *Id*. at 45. This Court determined that the defendant did not act in self-defense in part because surveillance evidence revealed no indication that the victim pulled out a gun or fired a gun at the defendant, which would have necessitated the defendant's use of deadly force. *Id*. at 47-48.

Additionally, although defendant testified that he feared for his life, there was no evidence that defendant had a reasonable and honest belief that the use of deadly force was necessary to prevent imminent death or great bodily harm. See *Dupree*, 486 Mich at 707. The reasonableness of a person's belief regarding the necessity of deadly force "depends on what an ordinarily prudent and intelligent person would do on the basis of the perceptions of the actor." *Orlewicz*, 293 Mich App at 102. In this case, considering all the facts and circumstances, an ordinarily prudent and intelligent person would not have found it reasonable to pursue the victim onto the bridge after the physical altercation with the victim had been abandoned, immediately point a gun at the victim, and, remaining completely silent, shoot the unarmed victim. See *Guajardo*, 300 Mich App at 42.

Therefore, viewing the evidence in the light most favorable to the prosecution, there was sufficient evidence to conclude that defendant did not act in self-defense.

## B. GREAT WEIGHT OF THE EVIDENCE

We review a trial court's determination that a verdict was not against the great weight of the evidence for an abuse of discretion. *Unger*, 278 Mich App at 232. A trial court abuses its discretion when it selects an outcome that is outside the range of principled outcomes. *People v Kosik*, 303 Mich App 146, 154; 841 NW2d 906 (2013). Determining whether a verdict is against the great weight of the evidence requires a review of the whole body of proofs. *People v Herbert*, 444 Mich 466, 475; 511 NW2d 654 (1993), overruled in part on other grounds *Lemmon*, 456 Mich 625. Absent exceptional circumstances, however, a reviewing court may not substitute its views regarding witness credibility for that of the jury. See *Lemmon*, 456 Mich at 642. "Generally, a verdict may be vacated only when the evidence does not reasonably support it and it was more likely the result of causes outside the record, such as passion, prejudice, sympathy, or some other extraneous influence." *People v Lacalamita*, 286 Mich App 467, 469; 780 NW2d 311 (2009). "The hurdle that a judge must clear in order to overrule a jury and grant a new trial is unquestionably among the highest in our law." *Unger*, 278 Mich App at 232 (quotation marks and citation omitted).

It is the jury's responsibility to decide credibility, and the trial court cannot take that away from the jury absent exceptions such as the testimony was patently incredible, defied physical realities, and was too implausible to be believed. See *Lemmon*, 456 Mich at 643. As previously indicated, the jury was presented with significant evidence that rebutted defendant's claim of self-defense, including the evidence that defendant emphasized as inconsistent and missing in his brief on appeal, i.e., portions of the witnesses' testimonies and the gap in the surveillance footage. It is

clear from the verdict that the jury did not find issues with any inconsistent testimony or the missing video footage and that the jury did not find defendant's self-defense claim to be credible. Therefore, having reviewed the record, we find no abuse of discretion in the trial court's deference to the jury's finding that defendant did not act in self-defense; their verdict was not contrary to the great weight of the evidence.

## IV. SUFFICIENCY OF THE EVIDENCE, IN THE ALTERNATIVE, GREAT WEIGHT OF THE EVIDENCE—PREMEDITATION AND DELIBERATION

Next, defendant argues that there was insufficient evidence to establish that defendant acted with premeditation or, alternatively, that the verdict was against the great weight of the evidence.

### A. SUFFICIENCY OF THE EVIDENCE

"[T]o secure a conviction of first-degree premeditated murder, the prosecution must establish beyond a reasonable doubt a '[m]urder perpetrated by means of poison, lying in wait, or any other willful, deliberate, and premediated killing." MCL 750.316(1)(a); *People v Oros*, 502 Mich 229, 240; 917 NW2d 559 (2018). "The elements of first-degree murder are: (1) the intentional killing of a human (2) with premeditation and deliberation." *People v Bennett*, 290 Mich App 465, 472; 802 NW2d 627 (2010). Premeditation means "to think about beforehand," and deliberation means "to measure and evaluate the major facets of a choice or problem." *People v Plummer*, 229 Mich App 293, 300; 581 NW2d 753 (1998) (quotation marks and citation omitted). Premeditation and deliberation require sufficient time to allow the defendant to reconsider his actions, or in other words, sufficient time to "take a second look." *People v Abraham*, 234 Mich App 640, 656; 599 NW2d 736 (1999) (quotation marks and citation omitted).

Factors relevant to establishing of premeditation and deliberation include: "(1) the prior relationship of the parties; (2) the defendant's actions before the killing; (3) the circumstances of the killing itself; and (4) the defendant's conduct after the homicide." *Abraham*, 234 Mich App at 656 (quotation marks and citation omitted). When evidence establishes that a fight occurred and then a killing, there must be a showing of "a thought process undisturbed by hot blood" to establish first-degree, premeditated murder. *Plummer*, 229 Mich App at 301 (quotation marks and citation omitted). "The critical inquiry is not only whether the defendant had the time to premeditate, but also whether he had the *capacity* to do so." *Id*. " 'Without such evidence, the sequence of events is as consistent with an unpremeditated killing—following hard on the outset of the argument—as it is with a premeditated killing after an interval during which there was an opportunity for cool-headed reflection.' " *Id*. at 302, quoting *People v Gill*, 43 Mich App 598, 606-607; 204 NW2d 699 (1972).

"Circumstantial evidence and reasonable inferences drawn therefrom may be sufficient to prove the elements of a crime." *People v Jolly*, 442 Mich 458, 466; 502 NW2d 177 (1993). Intent and premeditation may be inferred from all the facts and circumstances and, because of the difficulty of proving a person's state of mind, minimal circumstantial evidence is sufficient. *People v Cameron*, 291 Mich App 599, 615; 806 NW2d 371 (2011). An intent to kill may be inferred from the use of a dangerous weapon. *People v DeLisle*, 202 Mich App 658, 672; 509 NW2d 885 (1993). "[W]hat constitutes sufficient evidence to support the elements of premeditation and deliberation may vary from case to case because the factual circumstances will

-11-

vary, but the ultimate answer may be resolved in determining whether reasonable inferences may be made to support the fact-finder's verdict." *Oros*, 502 Mich at 243-244.

In this case, evidence was presented that vastly contradicted defendant's argument that he did not act with premeditation and deliberation. Witnesses testified that defendant almost immediately returned to the garage to retrieve his gun upon seeing someone who defendant thought could be the victim walking outside the condominium complex. Next, a physical altercation occurred in the garage minutes before defendant fatally shot the victim. Evidence was presented that defendant sustained injuries as a result of the altercation and that the victim was directing verbal profanities toward defendant, i.e., calling defendant a "pussy." Evidence was presented that defendant displayed his holstered gun on the palm of his hand and then transitioned from displaying his gun to unholstering the gun, loading the gun, and pointing it at the victim. During this, the victim repeatedly told defendant, "don't go there," and the witnesses pleaded with the victim to leave the garage, which the victim ultimately did. The initial encounter lasted for a couple of minutes until the victim exited the garage through the door with the witnesses and the door shut behind them. Further, defendant was in possession of a cell phone and, instead of calling 911 during or after the initial physical altercation, defendant took multiple photographs of the victim and the intervening witnesses as they walked through the door into the bridge.

After the victim abandoned and exited the scene of the initial altercation, defendant followed the victim and the witnesses into the bridge. To do this, defendant had to retrieve his keys, unlock the door from the garage into the bridge, and walk toward the victim and the witnesses that were in the process of walking away and into the condominium. The victim and the witnesses had their backs to defendant as he reappeared on the bridge. Despite the victim exiting the garage and complying with the witnesses' requests to leave, defendant continued to point his loaded gun at the victim immediately upon his entry into the bridge. Subsequently, defendant stood completely silent with his gun pointed at the victim for multiple minutes while making movement toward the victim until the victim was forced to defend himself by raising his arms and allegedly attempting to grab defendant's gun upon being "charged" by defendant. Then, defendant shot and killed the victim and walked away from the scene calmly and composed enough to stare at the victim as defendant walked past him, push a door open, and reholster his gun. Additional evidence was presented including defendant's inconsistent statements regarding the series of events and his conduct during his interviews with law enforcement.

Defendant asks this Court to rely on *Gill*, 43 Mich App at 598, to determine that there was insufficient evidence that defendant acted with premeditation and deliberation. In *Gill*, the defendant and the victim engaged in a physical alteration that resulted in a fight. *Id*. at 601. Similar to this case, the victim seemed to have been slightly dominating the altercation. *Id*. at 604. However, distinguishable from this case, during the same, continued altercation in *Gill*, the defendant displayed a knife and stabbed the victim with the knife at least two times when he found himself losing the fight. *Id*. at 601, 604. This Court determined that the sequence of events established a threat, a fight, and a killing and that there was no time factor between the threat, the fight, or any reflection from the defendant. *Id*. at 606. In this case, defendant had minutes to deliberate during the initial confrontation and the initial altercation was interrupted by intervening witnesses. Evidence was presented that it took the witnesses a "significant" amount of time to convince the victim to abandon the initial altercation. The victim then left the garage thereby successfully leaving the scene of the fight. Defendant then took multiple steps to follow the

victim's path of escape, reengage the victim, and initiate a second altercation in a completely different location under different circumstances.

In *People v Tilley*, 405 Mich 38, 45-46; 273 NW2d 471 (1979), the Michigan Supreme Court determined that the defendant acted with premeditation and deliberation by evaluating whether the fight had ended; it considered evidence regarding who obtained possession of the gun, the victim's retreat, and if the defendant or the victim were in control of the situation. In *Tilley*, the defendant's friend entered a restaurant and started an argument with the victim who was an undercover officer. *Id*. at 42. Subsequently, the friend, the defendant, and the victim exited the restaurant and continued their argument in the restaurant parking lot. *Id*. at 43. The defendant's friend pulled a gun from his pocket, and the victim knocked the gun to the ground, picked up the gun, and displayed his own gun placing the defendant's friend under arrest. *Id*. The defendant began to question the victim regarding his authority to arrest the defendant's friend, which distracted the victim enough to enable the friend to "jump" the victim. *Id*. A struggle ensued and the defendant obtained possession of the victim's gun. *Id*. The victim began to retreat to the restaurant and was shot during his retreat. *Id*. The Court emphasized the interval of time between the defendant securing possession of the gun and the first shot estimating that the period ranged from "one second to one minute." *Id*. Additionally, the Court reviewed the interval between defendant's first and subsequent gunshots and how the defendant held the gun with two hands as he pointed it at the victim. *Id*. at 45-46. The Court determined that the defendant had ample opportunity to premediate and deliberate. *Id*.

In *People v Livingston*, 63 Mich App 129, 134; 234 NW2d 176 (1975), this Court held that there was sufficient evidence for the jury to infer a premediated killing. In *Livingston*, the defendant entered a restaurant earlier in the afternoon and left after seeing the victim exclaiming, "I'll be back when I'm prepared." *Id*. at 130. Two hours later, the defendant returned. *Id*. at 131. Later, the defendant went to the restroom, and the victim followed the defendant into the restroom. *Id*. The parties engaged in a fight and exchanged "foul" words. *Id*. After the witnesses left the restroom, two gunshots were heard and the defendant was seen coming out of the restroom and leaving the bar with the gun in his hand. *Id*. at 132. This Court emphasized the two separate confrontations between the defendant and the victim, i.e., earlier in the afternoon and later when the altercation occurred, and acknowledged that the defendant fully expected a confrontation in the restroom. *Id*. at 133-134. This Court determined that there was a sufficient time lapse for the defendant to subject his conduct to a "second look." *Id*. at 134 (quotation marks and citation omitted). Similarly, in this case, defendant engaged in two altercations with the victim in the garage and then the bridge less than a minute later. The jury could have reasonably inferred that defendant fully expected the victim to be in the bridge area and that defendant had adequate time to a reflect on his conduct.

Accordingly, sufficient evidence was presented to support the jury's determination that defendant acted with premeditation and deliberation and there was sufficient evidence for defendant's conviction of first-degree murder.

## B. GREAT WEIGHT OF THE EVIDENCE

Addressing defendant's argument that the verdict was against the great weight of the evidence, defendant argues that we should disregard significant evidence regarding the

circumstances before, during, and following both the initial altercation and the altercation that resulted in the fatal shooting of the victim. Again, in determining whether a verdict is against the great weight of the evidence, the question is whether the evidence preponderates heavily against the verdict such that it would be a miscarriage of justice to allow the verdict to stand. *Lemmon*, 456 Mich at 642. A reviewing court may not substitute its view of the credibility of the witnesses for that of the jury unless there are exceptional circumstances and no such circumstances exist in this case. See *id*. at 643-646. The arguably inconsistent testimony did not contradict indisputable physical facts or laws, was not patently incredible or implausible, did not defy physical realities, and was not so far impeached that it was deprived of all probative value. See *id*. Accordingly, the jury's guilty verdict on the charge of first-degree premeditated murder was not against the great weight of the evidence and the trial court did not abuse its discretion by denying defendant's motion in this regard.

## V. DUE PROCESS

Lastly, defendant argues that the prosecution failed to preserve critical evidence and violated defendant's constitutional right to due process.

A defendant's claim that he was denied due process is reviewed de novo. *People v Schumacher*, 276 Mich App 165, 176; 740 NW2d 534 (2007). A nonconstitutional violation of discovery requirements does not require reversal unless the defendant establishes that it is more probable than not that the violation was outcome-determinative. *People v Elston*, 462 Mich 751, 766; 614 NW2d 595 (2000). An error is outcome-determinative if it undermined the reliability of the verdict. *Id*. In determining the reliability of the verdict, we should consider the nature of the error in light of the weight and strength of the untainted evidence. *Id*. at 765-766.

Criminal discovery is governed by MCR 6.201 and applies only to felonies. The purpose of discovery is "to promote the fullest possible presentation of the facts, minimize opportunities for falsification of evidence, and eliminate the vestiges of trial by combat." *People v Wimberly*, 384 Mich 62, 66; 179 NW2d 623 (1970) (quotation marks and citation omitted). There is no general constitutional right to discovery, *Elston*, 462 Mich at 765, but disclosure of exculpatory material and impeachment evidence is mandated by due-process principles. *Cone v Bell*, 556 US 449, 451; 129 S Ct 1769; 173 L Ed 2d 701 (2009). Further, under the Rules of Professional Conduct, a prosecutor has a duty to timely disclose to the defense all evidence and information known that tends to negate the defendant's guilt or mitigates the degree of the offense. MRPC 3.8(d); *People v Aldrich*, 246 Mich App 101, 111; 631 NW2d 67 (2001). Due process does not require the police to seek and find exculpatory evidence. *People v Coy*, 258 Mich App 1, 21; 669 NW2d 831 (2003). The failure to produce evidence not required to be disclosed does not establish good cause. *People v Greenfield (On Reconsideration)*, 271 Mich App 442, 451; 722 NW2d 254. If a party fails to comply with MCR 6.201, the court has the discretion to fashion a remedy, including ordering that testimony or evidence be excluded. MCR 6.201(J).

"[W]hen the State withholds from a criminal defendant evidence that is material to his guilt or punishment, it violates his right to due process of law in violation of the Fourteenth Amendment." *Cone*, 556 US at 469. To establish a violation of his due-process right to the disclosure of information, a defendant must show that: (1) the prosecution has suppressed evidence; (2) the evidence is favorable to the accused; and (3) the evidence, when viewed in its

totality, is material. *People v Chenault*, 495 Mich 142, 155; 845 NW2d 731 (2014). If a defendant can demonstrate that the prosecutor, in bad faith, failed to preserve material evidence that might have exonerated him, the defendant has demonstrated a violation of due process. *People v Heft*, 299 Mich App 69, 79; 829 NW2d 266 (2012).

For evidence of unknown probative value, which is only potentially exculpatory, loss of the evidence denies due process only when the police act in bad faith. *Arizona v Youngblood*, 488 US 51, 57-58; 109 S Ct 333; 102 L Ed 2d 281 (1988). Similarly, absent the intentional suppression of evidence or a showing of bad faith, the loss of evidence that occurs before a defense request for its production does not require reversal and the defendant bears the burden of showing that the evidence was exculpatory or that the police acted in bad faith. *People v Johnson*, 197 Mich App 362, 365; 494 NW2d 873 (1992). Evidence is material if there is a reasonably probability that, if the evidence had been disclosed, the result of the proceedings would have been different meaning that the likelihood of a different verdict is great enough that it undermines confidence in the trial's outcome. *Smith v Cain*, 565 US 73, 75; 132 S Ct 627; 181 L Ed 2d 571 (2012).

In *Johnson*, 197 Mich App at 365-366, this Court determined that, the defendant's "bald assertion" that the police deliberately destroyed evidence was not supported and that the defendant was not entitled to a reversal. In *Johnson*, the trial court ordered law enforcement to retain any tapes from the night of the defendant's arrest. *Id*. at 365. When law enforcement produced a tape, the tape was blank. *Id*. The defendant was seeking recordings of the radio traffic related to his arrest. *Id*. at 364. The defendant only presented evidence of "his own account of the events of the evening he was arrested" to support that the radio traffic recordings would have been exculpatory. *Id*. at 365. This Court explained that, "[a]bsent any other evidence, even circumstantial," law enforcement did not deliberately destroy evidence. *Id*. at 365-366. Similarly, in this case, defendant simply made an assertion that the gap in the surveillance footage coincided with his version of events and ignored the presented evidence that challenged the credibility of defendant's version of events.

Although factually distinguishable, this Court has emphasized law enforcement's handling and disposing of evidence according to standard police protocol in its determination to rebut a defendant's argument that law enforcement destroyed evidence in bad faith. See *People v Dickinson*, 321 Mich App 1, 17; 909 NW2d 24 (2017). Similarly, in this case, evidence was presented that law enforcement followed standard police protocol for processing the surveillance footage during the investigation.

We can consider that law enforcement properly retrieved video footage on the same night of the incident using a standard procedure to extract video evidence. Then, law enforcement returned to collect additional footage shortly after learning that it was necessary to expand their scope to different camera angles and to footage of different individuals. Additionally, defendant failed to factually support his belief that law enforcement destroyed any video evidence. To the contrary, evidence was presented that law enforcement did not destroy video evidence including testimony regarding the officer's immediate recovery of the footage, the condominium's cooperation with extracting the footage, and law enforcement's return for additional footage to supplement, and ultimately, enhance their investigation.

Further, when evaluating defendant's conduct after the gap in the surveillance footage, the jury observed the victim falling to the ground after being shot. The victim was positioned slightly to the left side of defendant corroborating trial evidence that the victim did not obstruct defendant's access to his condominium. Further, defendant was observed to be calm and composed and slowly walked away from the victim while reholstering his gun. Accordingly, defendant's conduct was not indicative of his asserted version of events. Further, defendant failed to present support that footage of the recording existed. At trial, defendant was aware of the testimony that supported the prosecution's argument that the footage did not exist because the cameras may have been motion activated, defendant knew they were motion activated, and he waited for the right moment. Defendant failed to rebut the prosecution's argument with any supporting evidence and ultimately waived the right to present an expert to testify regarding the camera system. Throughout the trial, defendant only made suggestions that the cameras were not motion activated and could have presented support for defendant's assertion that law enforcement acted in bad faith during the investigation.

In this case, evidence was presented that law enforcement learned that the condominium complex had video surveillance during their investigation. An officer was immediately assigned to extract any applicable video evidence to a flash drive and was provided with the basic parameters for his extraction process including the date and timing of the incident. Upon review of the video footage and becoming aware of an unknown individual walking around the complex during the initiation of the incident, the same officer was reassigned to obtain additional video footage. Evidence was presented that the officer followed all standard protocols for video extraction and that, on the basis of the lead officer's significant experience, the video extraction method was the most commonly used method by that police department. The video evidence was presented at trial as segments, in addition to, a complete compilation of various camera angles of the applicable parties during the events that led up to, occurred during, and followed after the incident. Unfortunately, for contested reasons, there was approximately a $2\frac{1}{2}$ minute gap in the video footage, and there was no video footage of the actual shooting— only the image of the victim on his hands and knees as defendant walked past the victim and exited the bridge while holstering his gun.

Defendant asserts that law enforcement acted in bad faith; however, evidence was presented that law enforcement went to the condominium twice to retrieve video evidence. Additionally, evidence was presented that the condominium complex was immediately cooperative and forthcoming regarding all surveillance footage and evidence associated with the incident. The complex was in control of the video footage throughout the investigation. Additionally, evidence rebutted defendant's uncorroborated claim that law enforcement acted in bad faith including: defendant's past familiarity with the surveillance system, the condominium complex permitting defendant to review the camera system in the past, and defendant's remarks to his former jail mate that the cameras were motion activated.

To explain the gap in the video footage, the detective testified that he dealt with motion-activated camera systems on a regular basis, implying, but acknowledging, that he could not be sure that this particular camera system was motion activated. Evidence was presented that justified the gap in the video footage and defendant failed to rebut the evidence apart from making a "bald assertion" that the police deliberately withheld or destroyed evidence. See *Johnson*, 197 Mich App at 365-366. Accordingly, defendant failed to establish that the prosecution actually withheld

evidence because defendant failed to establish that it existed and that law enforcement acted in bad faith.  Therefore, defendant failed to establish that his due-process rights were violated.

Affirmed.

/s/ James Robert Redford
/s/ Michael J. Riordan
/s/ Kathleen A. Feeney